### DOWELL *v.* APPLEGATE and others.

*(Circuit Court, D. Oregon.   January 5, 1883.)*

1. VOLUNTARY CONVEYANCE TO CHILDREN.

   A. was a surety on the official bond of M., and being liable thereon for defalcations of his principal, but without knowledge of the same, conveyed property to his children in consideration of their having remained at home and worked for him on the farm during their nonage, and in pursuance of a promise made by him to that effect, which conveyance left him without sufficient property to meet his existing liabilities under said bond. *Held,* that the services given to the father by the children were not a valuable consideration for the promise or the conveyances, as they only did what in law they were bound to do, and therefore the conveyances were voluntary, without a valuable consideration, and invalid as against the lien of a judgment subsequently obtained against A. on account of said defalcations, either by the obligee in the bond or a co-surety who had paid the full amount thereof.

2. SAME—GRANDCHILD.

   But a conveyance to a grandchild under like circumstances, upon a promise to said child and its father to make the same, is not voluntary, but a conveyance for a valuable consideration, and therefore valid as against such lien.

3. ESCHEAT FUND.

 The secretary of state, as such, is not authorized under the laws of Oregon (chapter 16, p. 582) to collect escheat funds from the treasurer of state; and if he does so without authority from the party entitled thereto, or fails to account to him for the same, his sureties are not holden therefor.

Suit in Equity in aid of a judgment creditor.

*Addison C. Gibbs* and the plaintiff in person, for plaintiff.

*W. Carey Johnson*, for defendants.

SAWYER, J. After a careful consideration of the pleadings, evidence, and arguments of counsel in this case, I have reached the following conclusions, which I shall announce without any elaborate discussion of the evidence, or the points presented.

I am not satisfied that Jesse Applegate, or the other defendants, had any actual knowledge of any defalcations of May, prior to the appointment of the investigating committee of the legislature in 1870, or at the date of the execution of the several conveyances sought to be set aside. On the contrary, the evidence largely preponderates in favor of the opposite conclusion. I think those conveyances were made and accepted in good faith, and without any intent to defraud the state, or to evade the payment of any liabilities of Jesse Applegate on the official bond of May, subsequently developed, and on which the judgment sought to be satisfied was afterwards recovered. There was, then, no actual fraud in making the conveyances, and they cannot be set aside on that ground.

The conveyances bearing date in April, 1867, I am satisfied were executed in that year. They bear date in April, 1867, and have certificates of acknowledgment appended thereto, which purport to have been made in May of that year, a few days after their dates; and all the direct testimony is that they were fully executed and delivered as early, at least, as the dates of acknowledgment; and that possession and control were taken in accordance with the conveyances. Conceding them to be voluntary conveyances from a father to his children for the purposes stated by them, they were made before any of the defalcations under the bond of 1866, and before any indebtedness accrued thereby to the state; and Jesse Applegate at the time owed no other debts than those arising upon the official bonds of May, 1862 and 1866, upon which judgments were subsequently recovered. The indebtedness on the bond of 1862 was comparatively small, being something over $1,300. If the defalcations on this bond had already arisen, it was not known to the defendants, and there was ample property of Jesse Applegate left after these conveyances were

made to satisfy this liability, as it was, in fact, afterwards satisfied out of other property of Jesse Applegate, without even resorting to any of the property subsequently conveyed to his other children by the remaining conveyances now in question. That judgment having been fully satisfied, the liability upon which the recovery was had, arising out of defalcations under the bond of 1862, cannot affect the questions now involved, either as to the conveyance of 1867 or those subsequently made, conceding them to be voluntary.

At the dates of the several conveyances in 1869, and subsequently, I do not think Jesse Applegate had sufficient property left, after making those conveyances, to reasonably satisfy the liabilities at that time accrued and existing on the bond of 1866, which have since passed into judgment against him and complainant, Dowell, and been paid by Dowell. Those conveyances made by Jesse Applegate of his rights to his children, I am satisfied were voluntary conveyances. The only consideration was a promise of the father to his several children that if they would remain at home with him, and work on the farm till they should, respectively, become of age, or marry, he would do by them as he had done by the older brothers— convey to them a part of his lands, putting them all upon an equality, without agreeing to convey any specific tract. This remaining with him was nothing more than they were bound to do under the law. They, therefore, neither gave nor promised any consideration. They remained, and the father simply fulfilled his promise, but the several conveyances can only be regarded in law as having been made upon consideration of love and affection—a worthy, proper, and lawful thing to do, when the father is free from debt, and able to do it without injury to third parties. But the law does not permit one to take that which really belongs, or ought to belong, to another, or is liable to satisfy another's demand, and give it to his children upon the consideration of love and affection. Some of these children, in fact, remained until after attaining their majority; but there is no independent additional agreement shown by the evidence, by which they were bound to so remain. There was no further contract for service, or further promise on account of their further services. I think, therefore, that these conveyances were taken subject to the rights of creditors existing at the time; and that the interest in the lands of Jesse Applegate attempted to be conveyed, is liable to be sold for the satisfaction of the judgment in favor of the state, which Dowell has paid; and that Dowell is subrogated to the rights of the state as to one-half of the amount of the judgment paid by him.

The conveyance to Charles Putnam, the grandson of Jesse Applegate, stands upon a different footing. He was under no obligation to serve Jesse Applegate, but he did continue in his service from 14 till over 21 years of age, on a promise made to him and to his father, some years before the execution of the official bond of May, 1866, that Applegate would convey to him a portion of land, in all respects, as he had done and agreed to do to his other children. This service formed a good and valuable pecuniary consideration, and the testimony shows that it was adequate to the value of the land. I think this conveyance valid as against the judgment now sought to be enforced. Jesse Applegate had only a life estate in the south half of the donation claim. The deed of Mrs. Applegate to her husband in the papers is not set up in the bill or pleadings, and is not relevant to any issue made. It cannot be known what defense might have been made to it, had it been alleged and relied on. It is not admissible, and cannot be considered. Mrs. Applegate's conveyances to her children are, therefore, valid as to her interest; and those interests are not liable to be applied to the satisfaction of the judgment in question.

A question arises on the record as to when the indebtedness to the state attached as against Jesse Applegate and complainant Dowell in consequence of the defalcations of May. Was it as to each embezzlement from the moment the funds were respectively appropriated, or from a demand on the part of the state and a failure to pay over the fund? Or at the close of the term when he failed to pay over on his retiring from office? Or when the amount was judicially ascertained by the judgment in the suit of the state against May and his sureties? These questions, though important, have not been argued by counsel, and no authorities have been cited on the questions. I do not see the bond in the record, but I suppose it contains the usual conditions in official bonds. If so, there must have been a breach at every time when May unlawfully appropriated the money of the state, as to the amount so appropriated, and I am disposed to think that this is the point of time as to each sum appropriated at which the liability or indebtedness of the sureties to the state attached.

Neither the state nor the complainant, Dowell, is entitled to any account of rents and profits of the lands from the dates of the several conveyances to the present time. Dowell has nothing in the land beyond a judgment lien, and this is neither a *jus ad rem* nor a *jus in re*, but simply a right to have his judgment satisfied out of the land. There is no trust in his favor, actual or constructive. Had

the property remained in Jesse Applegate, he would have been entitled to the use of it until an actual sale, as in the case of other real property sold on execution. His grantees are in no worse condition. The conveyances held valid I do not think void under the evidence in the case for want of stamps of greater value than the ones used. At all events, the complainant does not present a case of such superior equities as to entitle him to call upon a court of equity to grant him affirmative relief upon that ground.

A good deal has been said in the case about the money drawn out, ostensibly on behalf of an escheated estate, and used in the purchase of an organ for a church. That money seems to have been refunded by the church. I do not perceive that this matter in any way affects the case. I do not even see how the obtaining and use of this money by May, in the manner shown, could be an embezzlement of the funds of the estate for which his sureties are liable. I cannot find by the statute that he was in any way interested with that fund. It was to go into the treasury, and there remain until drawn out by some one authorized to draw it. It was got out by May in some way illegally, in the assumed character of agent for the parties legally entitled to receive the fund in a proper manner. May was not treasurer, and the fund was never intrusted by the state to his keeping for any purpose. He had no duties in connection with it. If, in his assumed character of agent for the parties, he unlawfully got hold of the money, he was doubtless liable to them, and perhaps to the state; but it was not an official act for which his sureties were liable. But I do not understand that this forms any part of the judgment paid by Dowell, or that it can in any view affect the rights of the parties in this case.

Upon the views taken, there must be a decree for the complainant subjecting the life interest of Jesse Applegate in those portions of the south half of the donation claim, and the whole of the remainder of the lands described in the bill embraced in all the conveyances made in 1869, or so much thereof as may be necessary to satisfy the judgment for all moneys and interest thereon arising from defalcations which had accrued at the date of the several conveyances respectively, and for costs

DEADY, J. I concur in the conclusions reached by the circuit judge in the foregoing opinion and the reasons given therefor; and after hearing the counsel for the parties, as directed by him, have settled the terms of the decree in the case.

Before stating them, it may be well to call attention to some of the leading facts in the case. On September 6, 1862, Jesse Applegate and others became sureties on the official bond of Samuel E. May, secretary of state, for the term of four years, and on August 4, 1866, said Applegate and B. F. Dowell became such sureties on his second official bond for a like period thereafter. At both these dates Jesse Applegate's property consisted substantially of certain lands, including the donation claim No. 38, in township 22 S., of range 5 W. of the Wallamet meridian, and situate in Douglas county, which, with the exception of a tract of 880 acres on Mt. Yoncalla, he subsequently conveyed to his children and one grandchild, in consideration of services performed by them on the farm during their nonage, and in pursuance of a promise by him to that effect, as follows: To William H. Applegate, 160 acres of the N. ½ of the donation claim by deed dated April 6, 1867, and 80 acres of the same by deed dated April 19, 1869; to Daniel W. Applegate, 146 acres in the S. ½ of the donation claim, in which he had a life estate for his own life, by deed dated April 6, 1867, and 80 acres lying partly in the N. and partly in the S. ½ of the donation, but the larger part in the latter, by deed dated April 20, 1869; to Peter Applegate, 175 acres of the S. ½ of said donation and 41.31 acres in section 28 of the township aforesaid by deed of April 21, 1869; to Sallie Applegate, 160 acres in section 23 of township 23 S., of the range aforesaid, by deed of December 2, 1871, and to Charles Putnam, his grandson, 240 acres in township 22 S., of the range aforesaid. At the date of the conveyances, in 1867, May was a defaulter to the state under his first bond in the sum of $1,328.29, and under his second bond he became a defaulter in the sum of $8,524.25, of which amount $5,546 was incurred before January 1, 1869. In 1874 the state obtained judgments on those bonds for these defalcations, amounting, with costs and expenses, to $11,-258.14. On June 27, 1878, Dowell obtained a judgment against Jesse Applegate in the circuit court for the county aforesaid for the sum of $4,882.19, the same being the one-half of the amount theretofore paid by him to the state on the judgment obtained by it against Dowell and Applegate on account of May's defalcations under the bond of 1866, together with $146.69 costs and disbursements, making in all the sum of $5,028.88; and on November 16, 1878, Dowell paid the state the remaining sum due on said judgment against himself and Applegate, to-wit, $1,385.64, and gave notice to the clerk of such payment, and his intention to claim contribution therefor, as pro-

vided in section 295 of the Code of Civil Procedure, and in pursuance of such notice and claim caused an execution to issue upon said judgment against Applegate, upon which the Mt. Yoncalla tract of land was sold, and the proceeds, less the costs of sale, applied upon said claim for contribution, so that upon May 31, 1879, there was only $284.61 due him from Applegate on that account.

After making the conveyances of 1867, Jesse Applegate had still sufficient property to discharge his obligations to the state growing out of May's defalcations up to that time, but at the date of the subsequent deeds the case was otherwise. The conveyances of 1869 left him without sufficient means to pay the defalcations which had then occurred under the second bond.

The decree of the court will be that the plaintiff has a lien upon the property of Jesse Applegate for the sum now due him on these judgments, to-wit, $7,488.48, and that the conveyances aforesaid, made since 1867, except the one to Charles Putnam, are, as against the lien of the plaintiff, invalid, and so far null and void; and that unless Jesse Applegate pay to the plaintiff the sum now due him, with his costs and expenses, within 20 days herefrom, the master of this court will proceed to sell, as upon an execution, all the interest of Jesse Applegate, on January 1, 1869, in the premises conveyed since 1867, except that portion conveyed to Charles Putnam, and after paying the expenses of the sale to bring the remainder of the proceeds into court for distribution or application, and that the purchaser at such sale have, if necessary, due process from the court to put him in possession.

---

No authorities need be cited to the proposition that a conveyance by a parent to his child, whether upon a valuable consideration or merely in consideration of love and affection, is valid, in the absence of creditors claiming the right to a satisfaction of their debts out of the property of the parent. But if the parent be in debt and make a voluntary conveyance of his property to his child or children with a view to insolvency, or intending that the property shall be held in secret trust for himself, or that the conveyance shall hinder, delay, or defraud his creditors, then it is void, and will be set aside by the courts. *Goodell* v. *Taylor*, Wright, (Ohio,) 82; *Carlisle* v. *Rich*, 8 N. H. 44; *Pepper* v. *Carty*, 11 Mo. 540; *Henry* v. *Fullerton*, 21 Miss. 631; *Wells* v. *Treadwell*, 28 Miss. 717; *Marston* v. *Marston*, 54 Me. 476; *Atkinson* v. *Phillips*, 1 Md. Ch. 507; *Clayton* v. *Brown*, 17 Ga. 217; *Mixell* v. *Lutz*, 34 Ill. 382; *Miller* v. *Thompson*, 3 Port. (Ala.) 198; *Gardner* v. *Booth*

*Lutz,* 34 Ill. 382; *Miller* v. *Thompson,* 3 Port. (Ala.) 198; *Gardner* v. *Booth,* 31 Ala. 186; *Benton* v. *Jones,* 8 Conn. 186; *Clayton* v. *Brown,* 17 Ga. 217; *Shepard* v. *Iverson,* 12 Ala. 97; *Parish* v. *Murphee,* 13 How. 92; *Jones* v. *Slubey,* 5 Har. & J. 372; *Kissen* v. *Edmundson,* 1 Ired. (N. C.) 180; *Ringgold* v. *Waggoner,* 14 Ark. 69; *Swartz* v. *Hazlett,* 8 Cal. 118; *New Haven Stm. Co.* v. *Vanderbilt,* 16 Conn. 420; *Steward* v. *Rogers,* 25 Iowa, 395; *Brady* v. *Briscoe,* 2 J. J. Marsh. (Ky.) 212; *Rucker* v. *Abel,* 8 B. Mon. (Ky.) 566; *Birdsale* v. *Lakey,* 6 La. Ann. 647; *Rousseau* v. *Lum,* 9 La. Ann. 325; *Hoye* v. *Penn,* 1 Bland, (Md.) 28; *Worthington* v. *Shipley,* 5 Gill, (Md.) 440; *Bullett* v. *Worthington,* 3 Md. Ch. 99; *Bryce* v. *Meyers,* 5 Ohio, 121; *Croft* v. *Arthur,* 3. Desaus. (S. C.) 223; *Chamberlayne* v. *Temple,* 2 Rand. (Va.) 384; *Coleman* v. *Cock,* 6 Rand. (Va.) 618; *Amy* v. *Young,* 15 N. H. 522; *Seward* v. *Jackson,* 8 Cow. 406; *Robinson* v. *Stewart,* 10 N. Y. 189; *Tripp* v. *Childs,* 14 Barb. 85; *Pell* v. *Treadwell,* 5 Wend. 661; *Sterry* v. *Arden,* 1 Johns. Ch. 261; *Waller* v. *Mills,* 3 Dev. (N. C.) Law, 515; *Jessup* v. *Johnson,* 3 Jones, (N. C.) Law, 335; *Smith* v. *Reavis,* 7 Ired. Law, 341; *Morgan* v. *McLelland,* 3 Dev. Law, 82; *O'Daniel* v. *Crawford,* 4 Dev. Law, 186; *Freeman* v. *Eastman,* 3 Ired. Eq. 81; *Black* v. *Caldwell,* 4 Jones, Law, 150; *Winchester* v. *Reid,* 8 Jones, Law, 377; *McGill* v. *Harman,* 2 Jones, Eq. 179; *Brown* v. *Godsey,* 2 Jones, Law, 417; *McKinnon* v. *Rogers,* 3 Jones, Eq. 200; *Edgington* v. *Williams,* Wright, (Ohio,) 439; *Greiger* v. *Welsh,* 1 Rawle, 349; *Miner* v. *Warner,* 2 Grant, Cas. 448; *Johnston* v. *Harvey,* 2 Pa. St. 82; *Nicholas* v. *Ward,* 1 Head, 323; *Hamilton* v. *Thomas,* 5 Hayw. (Tenn.) 127; *Dillard* v. *Dillard,* 3 Humph. 41; *Martin* v. *Oliver,* 9 Humph. (Tenn.) 561; *Redfield* v. *Buck,* 35 Conn. 328; *Chase* v. *McKay,* 21 La. Ann. 195; *Grimes* v. *Russell,* 45 Mo. 431.

It will be void though the conveyance be not directly from the father to the son, but from the father's vendor to the son, by the father's direction, he paying the vendor the purchase money for the property. *Doe* v. *McKinney,* 5 Ala. 719; *Patterson* v. *Campbell,* 9 Ala. 933; *Elliott* v. *Horn,* 10 Ala. 348; Ewell, Lead. Cas. 75; *Goodell* v. *Taylor,* Wright, (Ohio,) 82; *State Bank of Indiana* v. *Harrow,* 26 Iowa, 426. *Elliott* v. *Horn, supra,* is an interesting case illustrative of this rule.

So, although the son agree to pay the father's debts. *Swihart* v. *Shaum,* 24 Ohio St. 432; *Brady* v. *Briscoe,* 2 J. J. Marsh. (Ky.) 212. See, also, *Robinson* v. *Stewart,* 10 N. Y. 189. But see *Patteson* v. *Stewart,* 6 Watts & S. 72; *Preston* v. *Jones,* 50 Pa. St. 54.

But where A. advances money to B. to be paid as a part consideration of the purchase of a tract of land for A.'s grandson, C., a child of 12 years, on condition that the title be made to that child, and B. gives his note for the remainder of the consideration, and the title is made by the vendor to the child, who is the son of B., it will vest the title in C., and he will hold the land as against a subsequent purchaser at sheriff's sale under a judgment obtained on said note of B. *Roe* v. *Doe,* 32 Ga. 39.

The father's deed is void although made in compliance with a previous verbal promise to convey, made when unembarrassed. *Rucker* v. *Abell,* 8 B. Mon. (Ky.) 566. So, also, an antenuptial conveyance by a widow to her children, just prior to her second marriage, is a fraud upon the second husband. *Black*

v. *Jones*, 1 A. K. Marsh. (Ky.); *Petty* v. *Petty*, 4 B. Mon. (Ky.) 215. See, also, *Ramsey* v. *Joyce*, 1 McMull. (S. C.) Ch. 236; *Manes* v. *Durant*, 2 Rich. (S. C.) Eq. 404. But it has been held that an absolute voluntary conveyance of personalty by a husband to his children by a former wife is not a fraud on the rights of his wife which will avoid the transfer as to her. *Cameron* v. *Cameron*, 18 Miss. 394.

It need hardly be stated, so well settled is the law, that a voluntary conveyance is good between the parties, and the father may be compelled to deliver the property which he has conveyed. *Greenwood* v. *Coleman*, 34 Ala. 150. When the property has been delivered to the child, the father cannot recover possession of it. *Morris* v. *Harvey*, 4 Ala. 300. If the thing is conveyed to a son who lives at home and it remains in the family, possession of it is presumed to be in the son. *Humphries* v. *McCraw*, 9 Ark. 91.

Of course, if the conveyance from the parent is not voluntary, but is made upon a valuable consideration, it is good. Thus, the marriage of the child, contracted in consideration of the conveyance, is a valuable consideration which will sustain the transfer. *Verplank* v. *Sterry*, 12 Johns. 536; *Sterry* v. *Arden*, 1 Johns. Ch. 261; *Wood* v. *Jackson*, 8 Wend. 9; *Whelan* v. *Whelan*, 3 Cow. 537; *Mills* v. *Morris*, 1 Hoff. 419. But the rule that marriage constitutes a good and valuable consideration does not apply where a father makes a voluntary conveyance to his daughters, who afterwards marry, the father continuing in possession of the property after the conveyance, contracting debts and dying insolvent, so as to enable the daughters to hold the property against creditors of the father. *O'Brien* v. *Coulter*, 2 Blackf. (Ind.) 421. See, also, *Stokes* v. *Jones*, 18 Ala. 734.

Services rendered by minor children to parents do not constitute a valuable consideration for a conveyance by the parent to the children. *Stearns* v. *Gage*, 79 N. Y. 102; *Updike* v. *Titus*, 13 N. J. Eq. 151; *King* v. *Malone*, 31 Grat. 158; *Hack* v. *Stewart*, 8 Pa. St. 213; *Sanders* v. *Wagonseller*, 19 Pa. St. 248; *Miller* v. *Sauerbier*, 30 N. J. Eq. 71; *Bartlett* v. *Mercer*, 8 Ben. 439; *Griffin* v. *First Nat. Bank*, 74 Ill. 259; *Hart* v. *Flinn*, 36 Iowa, 366; *Zerbe* v. *Miller*, 16 Pa. St. 488; *Van Wyck* v. *Seward*, 18 Wend. 375.

Where a son, after he had attained the age of 21 years, continued for a few years to live with his father, support him, and to labor on his farm as he had previously done, no express contract as to the payment of wages by the father for the services of the son being proved to exist between them, it was held that the father could not, after he had became indebted and insolvent, create a debt in favor of the son which would sustain a conveyance from the father to the son. *Hack* v. *Stewart*, 8 Pa. St. 213.

A father agreed with two sons that if they would remain on his farm and assist in carrying it on and in educating their brothers, he would convey the farm to them, and in consideration of their services and their agreement to support him and their mother the remainder of their lives, he subsequently executed the conveyance, and it was held void against creditors. *Graham* v. *Rooney*, 42 Iowa, 567. See, also, *Griffin* v. *First Nat. Bank*, 74 Ill. 259. So a conveyance of real estate by parents to their daughter, the alleged consideration being a cow and its increase, given to her by her grandfather many years before and services performed by her while in the family during two or three

years after attaining her majority, and without any agreement that she was to receive compensation, is fraudulent. *Hart* v. *Flinn*, 36 Iowa, 366.

As to the decision in the principal case upon the first two points stated in the head-note, there can be no question as to its entire correctness, and the case affords an interesting and instructive application of well-settled principles.                                   M. D. EWELL.

*Chicago, March* 2, 1883.